IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| TRANSAMERICA LIFE INSURANCE COMPANY and TRANSAMERICA CORPORATION, <br><br> Plaintiffs, <br><br> v. <br><br> JINGBIN DOUGLAS, JEROME EDWARD DOUGLAS, II, PENNY GRACE JUDD and DANIEL DOUGLAS, <br><br> Defendants. | NO. 3:21-cv-00194 <br><br> JUDGE RICHARDSON |

## MEMORANDUM OPINION

Transamerica Life Insurance Company and Transamerica Corporation ("Transamerica") filed this action to determine the proper beneficiaries of proceeds from four benefit plans held by Jerome Edward Douglas Sr. ("Jerry") upon his passing.[1] Transamerica names the following potential beneficiaries of Jerry's benefits: Jingbin Douglas, who identifies herself as Jerry's wife; Jerome Edward Douglas, II ("Jed"), Jerry's adult son; Penny Grace Judd, Jerry's adult daughter; and Daniel Douglas, Jerry's brother. Jed asserts four crossclaims against Jingbin, and Jingbin asserts three crossclaims against Jed.[2] Before the Court is Jingbin's motion to dismiss Jed's crossclaims for a declaratory judgment and partition based on a lack of subject-matter jurisdiction

---

[1] Several parties in this case share the surname "Douglas," so the Court will refer to the potential beneficiaries by their first names for clarity. And the Court will refer to proceeds from the four benefit plans at issue in this case, collectively, as "Jerry's benefits."

[2] Penny and Jingbin filed crossclaims against one another as well, but they later settled such claims. (Doc. No. 113.) Accordingly, any parts of pending motions that relate specifically to the now-dismissed crossclaims as asserted between Penny and Jingbin have been denied as moot. (*Id.* at 2.)

under Fed. R. Civ. P. 12(b)(1).[3] (Doc. No. 34.)[4] For the following reasons, Jingbin's motion will be granted in part and denied in part, and the Court will also sua sponte dismiss part of Jingbin's crossclaim for a declaratory judgment based on a lack of subject-matter jurisdiction, pursuant to Fed. R. Civ. P. 12(h)(3).

## I. Summary of Allegations and Evidence Related to Jurisdiction[5]

### A. Jingbin and Jerry's Relationship

Jingbin and Hongwei Tang were married in China. (Doc. No. 19, Crossclaim ¶ 16 (Jed's Answer).) Jingbin moved to the United States, and, in September 2011, filed for divorce from Mr. Tang in the Davidson County Circuit Court. (Doc. No. 19-1.) In October 2011, Mr. Tang filed a motion to dismiss the divorce complaint for lack of personal jurisdiction (Doc. No. 35-1), asserting that he had resided in Texas since moving to Houston from China (without Jingbin) in 2007. (Doc.

---

[3] Jingbin's motion to dismiss ostensibly appears to apply to all of Jed's crossclaims (Doc. No. 34 at 1; Doc. No. 35 at 1), but Jed argues that the substance of the motion pertains only to his claims for a declaratory judgment and partition (Doc. No. 58 at 4), and Jingbin acknowledges as much in her reply. (*See* Doc. No. 62 at 3.) Jingbin's motion also states that it seeks dismissal both for lack of subject-matter jurisdiction under Fed. R. Civ. P 12(b)(1) and for failure to state a claim upon which relief can be granted under Fed. R. Civ. P. 12(b)(6). (Doc. No. 35 at 6.) As reflected in the analysis below, however, Jingbin's arguments for dismissal pertain solely to the Court's subject-matter jurisdiction.

[4] Jingbin and Jed have also filed motions for summary judgment (Doc. Nos. 96, 100), but because Jingbin's motion to dismiss is based on an asserted lack of subject-matter jurisdiction, the Court will consider the motion to dismiss before the summary judgment motions. *See Tubbs v. Long*, No. 3:20-CV-00477, 2022 WL 508895, at *3 (M.D. Tenn. Feb. 17, 2022) ("Subject matter jurisdiction is always a threshold determination.") (quoting *Am. Telecom Co. v. Republic of Lebanon*, 501 F.3d 534, 537 (6th Cir. 2007)).

[5] This summary is drawn from Transamerica's Amended Complaint, Jed's Answer (the pleading containing Jed's crossclaims), documents attached to both of these pleadings, and documents attached to the briefing for Jingbin's motion to dismiss. This summary focuses on the allegations and evidence relevant to deciding whether the Court has subject-matter jurisdiction over the claims challenged in Jingbin's motion to dismiss (Jed's crossclaims for a declaratory judgment and partition). As discussed below, the Court construes Jingbin's motion to be a factual attack on subject-matter jurisdiction, so no presumptive truthfulness attaches to the allegations in the pleadings, though the Court may refer to such allegations here for context. Instead, the Court will weigh the evidence to make a determination on the factual existence of subject-matter jurisdiction. *See Mucerino v. Martin*, No. 3:21-cv-00284, 2021 WL 5585637, at *3 (M.D. Tenn. Nov. 30, 2021) ("A factual attack is a challenge to the factual existence of subject matter jurisdiction.").

No. 35-2.) Jingbin submitted documents reflecting that a Chinese Court granted a divorce between Jingbin and Mr. Tang on June 18, 2012 ("Chinese divorce decree"). (Doc. No. 35-3.)

In May 2013, Jingbin and Jerry participated in a marriage ceremony. (Doc. No. 16 ¶ 31 (Transamerica's Amended Complaint).) The Tennessee Department of Health issued a certificate listing Jingbin and Jerry as married ("Tennessee marriage certificate"). (Doc. No. 35-4.) In July 2013, Jingbin filed a notice of voluntary nonsuit of the divorce complaint against Mr. Tang in the Davidson County Circuit Court. (Doc. No. 19-2.) Around that time, Jerry applied for Jingbin to receive permanent resident status, and the application stated that Jingbin's marriage to Mr. Tang was terminated on the date provided in the Chinese divorce decree. (Doc. No. 35-5.) The application for permanent residence was approved on December 10, 2013. (Doc. No. 35-6.)

In February 2014, Jingbin and Jerry together purchased the first of three properties in Nashville (collectively, "Nashville properties"). (Doc. No. 19, Crossclaim ¶ 26.) On May 13, 2015, according to a document identified by Jingbin as Jerry's will, Jerry executed a will appointing Jingbin as executrix and stating, "I give, devise, and bequeath to my wife, Jingbin Douglas, any property, both real and personal wherever situated and of whatever nature." (Doc. No. 35-9.) Jingbin and Jerry purchased their second and third properties together in July 2017 and August 2018, respectively. (Doc. No. 19, Crossclaim ¶ 26.)

In 2019, Jerry fell ill with complications from cancer, lost the ability to care for himself, and "became incompetent to contract." (*Id.* ¶ 30.) Jed submitted quitclaim deeds dated March 5, 2020, for each of the Nashville properties, that appear to convey Jerry's interest in the Nashville properties to Jingbin. (Doc. No. 19-4.) Jerry's condition worsened throughout 2020. (Doc. No. 19, Crossclaim ¶ 34.)

B.     State-Court Proceedings

On August 18, 2020, Jed filed a Petition for Appointment of a Conservator in Davidson County Circuit Court ("Conservatorship Court"). (Doc. No. 35-13.) On August 19, 2020, the Conservatorship Court appointed an emergency conservator for Jerry pending an evidentiary hearing. (Doc. No. 16 ¶ 34.) On August 21, 2020, Jingbin filed an Order of Protection against Jed. (Doc. No. 19-5.) On August 27, 2020, after a hearing, the Conservatorship Court found that there was sufficient evident to appoint a conservator for Jerry. (Doc. No. 16 ¶ 36.)

Jerry died on September 6, 2020. (Doc. No. 35-8 at 3.) On September 11, 2020, Jingbin filed a Petition for Letters Testamentary in the Davidson County Circuit Court ("Probate Court"). (Doc. No. 58-1.) The Probate Court entered an order stating that, on October 15, 2020, the Probate Court held a hearing at which Jed and Penny's attorney obtained a continuance of the probate proceedings by raising questions regarding 1) the validity of Jingbin and Jerry's marriage and 2) the validity of the signature purportedly belonging to Jerry on Jerry's will. (Doc. No. 35-10.) On November 25, 2020, the Probate Court issued Letters Testamentary to Jingbin that stated (among other things), "It appearing to the Court that [Jerry] has died leaving a written Will in which you are appointed Executor and which has been duly approved by the Court." (Doc. No. 35-12 (Letters Testamentary); *see also* Doc. No. 58-2 (Order for Letters Testamentary).)

C.     Jerry's Benefits

When Jerry died, he had four benefit plans through Transamerica that are at issue in this case: a Pension Plan, a 401(k) Plan, a Basic Life Insurance Plan, and a Supplemental Life Insurance Plan. (Doc. No. 16 ¶ 10.) The Pension Plan provides that the death benefit of a plan participant shall be paid to his or her spouse (defined as "the person to whom the participant is legally married"), if the participant had a spouse at the date of death. (*Id.* ¶ 12.) The 401(k) Plan requires

a legally-married spouse to be designated as the sole primary beneficiary, unless the spouse consents to a choice of a different beneficiary. (*Id.* ¶ 14.) The Basic and Supplemental Life Insurance Plans establish the right of participants to name their beneficiaries. (*Id.* ¶ 17.) At the time of Jerry's death, Transamerica's records reflected that the beneficiary designations for Jerry's Basic Life Insurance Plan were 10% to Jed, 10% to Penny, and 80% to Jingbin. (*Id.* ¶ 22.) And for Jerry's Supplemental Life Insurance Plan, Transamerica's records reflected that the beneficiary designations were 5% to Jed, 5% to Penny, 5% to Daniel, and 85% to Jingbin. (*Id.* ¶ 23.)

After Jerry's death, Penny wrote to Transamerica and requested a formal review of communications regarding Jerry's beneficiary designations. (*Id.* ¶ 28.) Penny expressed concerns regarding changes in Jerry's beneficiary designations and stated that Jerry's illness impacted his mental capabilities and decision making for part of 2019 and all of 2020. (*Id.*) Jed also wrote to Transamerica and stated that 1) Jerry was incompetent from October 2019 until his death, and 2) Jingbin and Jerry's marriage "was a nullity because she did not obtain a divorce from her prior husband, Hongwei Tang, in the U.S. prior to marrying [Jerry] in May of 2013." (*Id.* ¶¶ 29, 31.) In a reply to Transamerica, Jingbin stated that Jerry remained competent until May 2020, and that she and Mr. Tang obtained a divorce in China in 2012. (*Id.* ¶¶ 30, 32.)

D. <u>Pending Claims in This Case</u>

On August 11, 2021, Transamerica filed an Amended Complaint in Interpleader, requesting to have this Court resolve the potential beneficiaries' claims to Jerry's benefits. (Doc. No. 16 ¶¶ 37–41.)

On September 8, 2021, Jed filed an Answer asserting crossclaims against Jingbin for: 1) a declaratory judgment; 2) partition; 3) abuse of process; and 4) intentional infliction of emotional distress. (Doc. No. 19, Crossclaim ¶¶ 53–66.) Specifically, Jed requests declarations that: a)

Jingbin and Jerry were not legally married; b) because Jingbin and Jerry were not legally married, the Nashville properties were held as co-tenants without a right of survivorship; c) Jerry was incompetent to execute the three quitclaim deeds to Jingbin for his interest in the Nashville properties; d) because Jerry was incompetent to execute the quitclaim deeds, the quitclaim deeds are invalid; e) because Jingbin and Jerry held the Nashville properties as co-tenants without a right of survivorship, Jerry's interest in the Nashville properties now vests in Jed and Penny; and f) Jed and Penny are entitled to the entirety of the proceeds from Jerry's benefits. (*Id.* ¶ 54.)

On March 29, 2022, Jingbin filed an Amended Answer asserting crossclaims for: 1) a declaratory judgment; 2) abuse of process (Doc. No. 65, Crossclaim ¶ 4); and 3) "negligent and intentional infliction of emotional distress." (*Id.*, Crossclaim ¶ 11.) Specifically, Jingbin requests declarations that: Jingbin is Jerry's surviving spouse "as defined in the applicable Plan documents" (*id.*, Crossclaim at p.16, subsection (b)); and Jed, Penny, and Daniel are not eligible beneficiaries for Jerry's Basic and Supplemental Life Insurance Plans. (*Id.*, Crossclaim at p.17, subsection (h).)

## II. Legal Standard

"There are two types of motions to dismiss for lack of subject-matter jurisdiction: facial and factual attacks." *Accord v. Anderson Cnty., Tenn.*, No. 3:21-CV-00077, 2021 WL 6135691, at *1 (M.D. Tenn. Dec. 28, 2021) (citing *Gentek Bldg. Prods., Inc. v. Sherman-Williams Co.*, 491 F.3d 320, 330 (6th Cir. 2007)). The applicable legal standard depends on the type of attack:

> A facial attack challenges merely the sufficiency of the pleading. When reviewing a facial attack, a district court takes the allegations in the complaint as true. If those allegations establish cognizable federal subject-matter jurisdiction, jurisdiction exists. A factual attack instead raises a factual controversy concerning whether subject-matter jurisdiction exists. Where there is a factual attack on the subject-matter jurisdiction of the court under Fed. R. Civ. P. 12(b)(1), no presumptive truthfulness applies to the complaint's allegations; instead, the court must weigh the conflicting evidence to arrive at the factual predicate that subject-matter jurisdiction does or does not exist.

*Bush v. Reliant Bank*, No. 3:21-cv-00525, 2022 WL 2359635, at *3 (M.D. Tenn. June 30, 2022) (citation omitted). Courts reviewing factual attacks have "wide discretion to allow affidavits, documents, and even a limited evidentiary hearing to resolve jurisdictional facts." *Doe v. Lee*, No. 3:21-cv-00809, 2022 WL 1164228, at *4 (M.D. Tenn. Apr. 19, 2022) (citing *Gentek*, 491 F.3d at 330) (footnote omitted). "The existence of subject matter jurisdiction may be raised at any time, by any party, or even sua sponte by the court itself." *Days Inns Worldwide, Inc. v. Patel*, 445 F.3d 899, 904 (6th Cir. 2006) (quoting *In re Lewis*, 398 F.3d 735, 739 (6th Cir. 2005)). And "[a]s always, the party invoking federal jurisdiction has the burden to prove that jurisdiction." *Doe*, 2022 WL 1164228, at *4 (citations omitted).

Jingbin does not specify whether her challenge is facial or factual, but for two reasons, the Court considers it to be factual. First, Jingbin relies on evidence within thirteen attachments to her motion to dismiss, seemingly inviting the Court to consider this evidence when it rules on her motion, which the Court could not do if the attack were facial. *See Doe*, 2022 WL 1164228, at *4 ("The fact that a motion is one under Rule 12(b)(1) is not dispositive of whether the Court may consider Plaintiff's evidence; what is dispositive of whether evidence (as opposed to the complaint's mere allegations) can be considered on a Rule 12(b)(1) motion is whether the motion presents a facial attack on subject-matter jurisdiction or, instead, a factual attack on subject-matter jurisdiction. As discussed above, consideration of such evidence is appropriate when analyzing a 12(b)(1) motion that is a factual attack, but not when analyzing a facial attack."). Second, Jed characterizes the attack as factual in his response (Doc. No. 58 at 7), and Jingbin does not take issue with this characterization in her reply. (*See* Doc. No. 62.) Accordingly, the Court will construe Jingbin's motion as a factual attack on the Court's subject matter jurisdiction.

### III. Analysis

Jingbin invokes three different legal principles in support of the requested dismissal of Jed's crossclaims for a declaratory judgment and partition: the prior suit pending doctrine, the domestic relations exception, and the probate exception. (Doc. No. 34.)

#### A. Prior Suit Pending

Jingbin contends that based on the proceedings in the Probate Court, Jed's crossclaims for a declaratory judgment and partition should be dismissed under the prior suit pending doctrine. (Doc. No. 35 at 9–11.) This is a doctrine of Tennessee law. *See Collins v. Sams E. Inc.*, No. W2017-00711-COA-R3-CV, 2018 WL 1299857, at *3 (Tenn. Ct. App. Mar. 13, 2018) (collecting authority for the proposition that a Tennessee state court acting in violation of the prior suit pending doctrine "lacks subject matter jurisdiction to adjudicate the controversy"). As explained by the Tennessee Supreme Court, this doctrine is derived from the "common-law rule prescribing that a person shall not be . . . twice vexed for one and the same cause." *See West v. Vought Aircraft Indus., Inc.*, 256 S.W.3d 618, 622 (Tenn. 2008) (internal citations and quotation marks omitted). But "[t]he Sixth Circuit has made clear that the prior suit pending doctrine does not operate to bar federal litigation after jurisdiction has been established as it 'is a state law doctrine which plainly does not apply to federal courts.'" *Cent. Bank v. Jerrolds*, No. 14-1163, 2015 WL 1486368, at *6 n.7 (W.D. Tenn. Mar. 31, 2015) (quoting *Laney Brentwood Homes, LLC v. Town of Collierville*, 144 F. App'x 506, 511 (6th Cir. 2005)). Accordingly, Jingbin's reliance on the prior suit pending doctrine is unavailing.[6]

---

[6] While noting the Sixth Circuit's stance on this issue, the undersigned has considered the prior suit pending doctrine "under Tennessee law when determining whether a fraudulent joinder has occurred" in a case that was originally filed in (and ultimately remanded to) state court. *See Patel v. Henslee Chicken, LLC*, No. 3:20-cv-00281, 2020 WL 7260926, at *7 n.11 (M.D. Tenn. Dec. 10, 2020) (noting that the Eastern and Western Districts of Tennessee have taken the same approach). But that context is not present here. The

B. <u>Domestic Relations Exception</u>

The domestic relations exception is a doctrine of federal law. *See Marshall v. Marshall*, 547 U.S. 293, 299 (2006) (describing the domestic relations exception as a "judicially created doctrine[]" that is a "longstanding limitation[] on federal jurisdiction otherwise properly exercised"). This doctrine precludes federal courts from exercising jurisdiction over certain claims that involve "the issuance of a divorce, alimony, or child custody decree." *Alexander v. Rosen*, 804 F.3d 1203, 1205 (6th Cir. 2015) (quoting *Ankenbrandt v. Richards*, 504 U.S. 689, 704 (1992)). It "relates not to the subject of domestic relations, but to particular status-related *functions* that fall within state power and competence." *Chevalier v. Est. of Barnhart*, 803 F.3d 789, 797 (6th Cir. 2015) (citation omitted). To determine whether a federal court is called upon to intrude on a function reserved for state courts under the domestic relations exception, the Court must focus on the remedy sought by the party invoking federal jurisdiction and ask: "Does [that party] seek an issuance or modification or enforcement of a divorce, alimony, or child-custody decree?" *Id.* (citations omitted). If the answer is yes, then the Court lacks jurisdiction; if the answer is no, then the Court retains jurisdiction.[7]

---

Court's original jurisdiction in this case is a matter of federal question jurisdiction, 28 U.S.C. § 1331, as Transamerica filed this case to resolve a dispute arising under a federal law, namely the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1001, et seq. (Doc. No. 16 ¶ 8.)

[7] As stated in the prior footnote, the Court's original jurisdiction in this case is a matter of federal question jurisdiction. Several circuits have held that the domestic relations exception "applies only to diversity (rather than federal question) cases." *Alexander*, 804 F.3d at 1205 (6th Cir. 2015) (collecting cases from the Fourth, Fifth, and Ninth Circuits). In 1981, however, the Sixth Circuit stated that the domestic relations exception can apply in federal question cases. *Firestone v. Cleveland Tr. Co.*, 654 F.2d 1212, 1215 (6th Cir. 1981). Since then, the Supreme Court has issued two opinions discussing the domestic relations exception in depth. *See Ankenbrandt*, 504 U.S. 689; *Marshall*, 547 U.S. 293. Neither Supreme Court opinion expressly limited application of the domestic relations exception to diversity cases, and the Sixth Circuit has not since contradicted its 1981 precedent. *See Alexander*, 804 F.3d at 1205 (declining to revisit its pre-*Ankenbrandt* precedent on this issue). So this Court remains bound by Sixth Circuit authority holding that the domestic relations exception can be applicable in federal question cases. *See Firestone*, 654 F.3d at 1215; *see also Chambers v. Michigan*, 473 F. App'x 477, 479 (6th Cir. 2012) ("Even when brought under the guise of a federal question action, a suit whose substance is domestic relations generally will not be entertained in a federal court." (citing *Firestone*, 654 F.2d at 1215)).

Jingbin argues that the domestic relations exception applies here because Jed's claims for a declaratory judgment and partition ask the Court to invalidate a divorce decree. (Doc. No. 35 at 11–12.) Jingbin does not explicitly state what divorce decree she is referring to in this argument, and Jed responds as though Jingbin is referring to a divorce between herself and Jerry—a divorce which, as Jed points out, did not occur (and thus would not be one that Jed would be seeking herein to invalidate). (*See* Doc. No. 58 at 14 ("Logically, . . . Jed [is] contending that [Jerry] and Jingbin were never legally married. If a couple are never legally married, then that couple cannot be legally divorced because the marriage itself never existed.").) There is, however, a different divorce at issue in this case: the divorce that Jingbin asserts occurred between Jingbin and Mr. Tang. (*See* Doc. No. 35 at 2 (asserting that "[t]he documents affirming the divorce [between and Mr. Tang] have been recognized and authenticated by the Consulate General of the United States in Guangzhou, China and by the U.S. Department of State").)

With Jingbin's motion to dismiss, she submitted a Chinese divorce decree reflecting that Jingbin and Mr. Tang were divorced on June 18, 2012. (Doc. No. 35-3.) Jingbin also submitted a Tennessee marriage certificate reflecting that she and Jerry were married on May 24, 2013. (Doc. No. 35-4.)

Jed seeks a total of six declarations via his declaratory judgment claim. (Doc. No. 19, Crossclaim ¶ 54.) The first requested declaration asks the Court to declare that Jingbin and Jerry were not legally married. (*Id.* ¶ 54(a).) This request is based on Jed's allegation that the June 2012 Chinese divorce decree is "void," such that Jingbin was still legally married to Mr. Tang when she participated in the May 2013 marriage ceremony with Jerry, rendering Jingbin's marriage to Jerry legally invalid. (*See id.* ¶¶ 23–25.) Jed's first requested declaration, therefore, would invalidate both the Chinese divorce decree and the Tennessee marriage certificate. Jed's second requested

declaration incorporates the first requested declaration (*id.* ¶ 54(b) (requesting a declaration that, because Jingbin and Jerry were not legally married, the Nashville properties were held as co-tenants without a right of survivorship)); and another requested declaration is dependent on the first and second requested declarations. (*Id.* ¶ 54(e) (requesting a declaration that, because Jingbin and Jerry held the Nashville properties as co-tenants without a right of survivorship, Jerry's interest in those properties now vests in Jed and Penny).) By seeking to invalidate a divorce decree and a marriage certificate, these three requested declarations fit within the narrow confines of the domestic relations exception. *See Harnett v. Est. of Chislett*, 487 F. Supp. 3d 1270, 1273–74 (S.D. Ala. 2020) (applying domestic relations exception where plaintiffs sought declarations that two foreign divorces (one in the Dominican Republic and one in Taiwan) and one domestic marriage were invalid); *cf. Chevalier*, 803 F.3d at 797 (declining to apply the domestic relations exception, in part, because the plaintiff did not "request that the federal courts nullify her marriage").

On the other side of this same coin, Jingbin asks the Court for a declaration equivalent to declaring that Jingbin and Jerry *were* legally married. (Doc. No. 65, Crossclaim at p.16, subsection(b).)[8] In other words, while Jed requests declarations that would invalidate the Chinese divorce decree and the Tennessee marriage certificate, Jingbin requests a declaration that would enforce them. The domestic relations exception applies to both sides of this request in the same way and for the same reasons. And because the domestic relations exception is a matter of subject-

---

[8] Jingbin specifically requests a declaration that she is Jerry's surviving spouse "as defined in the applicable Plan documents." (Doc. No. 65, Crossclaim at p.16, subsection(b).) Documents for these plans are attached to Transamerica's Amended Complaint. The Pension Plan defines "spouse" as "the person to whom the Participant is legally married." (Doc. No. 16-1 at 17.) The 401(k) Plan repeatedly uses the phrase "legally married spouse" (Doc. No. 16-2 at 3, 29), reflecting that it, too, considers a spouse to be the person to whom the participant is legally married. And the Life Insurance Plan defines "spouse" as a "person legally married under the local state law in which the marriage is celebrated." (Doc. No. 16-3 at 6.) Thus, making a declaration that Jingbin is Jerry's surviving spouse "as defined in the applicable Plan documents" would require the Court to declare that Jingbin and Jerry were legally married.

matter jurisdiction, the Court must dismiss this aspect of Jingbin's declaratory judgment claim as well, despite the lack of a formal request to do so. *See Accord*, 2021 WL 6135691, at *6 n.3 ("[T]he court must act to dismiss claims to the extent that it perceives that it lacks subject-matter jurisdiction.") (citing Fed. R. Civ. P. 12(h)(3)).

As for all other claims in in this case, however, the domestic relations exception does not apply. Jed's three remaining requested declarations would not invalidate the Chinese divorce decree and/or the Tennessee marriage certificate; rather, these requested declarations seek a determination of the validity of the quitclaim deeds for the Nashville properties (Doc. No. 19, Crossclaim ¶ 54(c), (d)), as well as the proper beneficiaries of Jerry's benefits. (*Id.* ¶ 54(f).) Jingbin's remaining requested declaration, likewise, would not serve to enforce the Chinese divorce decree and the Tennessee marriage certificate; instead, it seeks a determination on the eligibility of Jed, Penny, and Daniel to be beneficiaries of Jerry's Basic and Supplemental Life Insurance Plans. (Doc. No. 65, Crossclaim at p.17, subsection (h).) Aside from the declaratory judgment claims, Jed's crossclaims seek either the sale of particular property or money damages (*Id.* ¶¶ 57, 61–62, 66), and Jingbin's crossclaims seek money damages. (Doc. No. 65, Crossclaim at p.8–9.) Finally, Transamerica's original request to the Court in this case is to distribute the proceeds from Jerry's benefits to the proper beneficiaries as determined by the Court (Doc. No. 16 ¶¶ 37–41)—a request untethered to the state-court functions with which the domestic relations exception is concerned. *See Aetna Health Inc. v. Davila*, 542 U.S. 200, 208 (2004) ("The purpose of ERISA is to provide a uniform regulatory regime over employee benefit plans. To this end, ERISA includes expansive pre-emption provisions, which are intended to ensure that employee benefit plan regulation would be exclusively a federal concern." (internal citations and quotation marks omitted)). Thus, maintaining a narrow focus on the remedies sought by the parties invoking

jurisdiction for their claims, the Court concludes that the domestic relations exception does not preclude the Court from exercising jurisdiction over the claims discussed in this paragraph.

    C.    <u>Probate Exception</u>

The probate exception, like the domestic relations exception, is a doctrine of federal law. *See Chevalier*, 803 F.3d at 801 (holding that courts "look to only federal law to determine whether the probate exception" applies). This doctrine precludes federal courts "from exercising jurisdiction over certain conflicts involving property subject to a state court probate proceeding." *Osborn v. Griffin*, 865 F.3d 417, 434 (6th Cir. 2017) (internal citations and quotation marks omitted). It "reserves to state probate courts the probate or annulment of a will and the administration of a decedent's estate; it also precludes federal courts from endeavoring to dispose of property that is in the custody of a state probate court." *Id.* (quoting *Marshall*, 547 U.S. at 311–12). But "[a] case does not fall under the probate exception if it merely impacts a state court's performance of one of these tasks." *Wildasin v. Mathes*, No. 3:14-cv-02036, 2019 WL 2269878, at *4 (M.D. Tenn. May 28, 2019) (citing *Chevalier*, 803 F.3d at 801).

No claims in this case seek to probate a will, annul a will, or administer Jerry's estate. Through his remaining requested declarations and his partition claim, however, Jed is seeking ownership and sale of the Nashville properties. Thus, for purposes of applying the probate exception, the Court must decide whether the Nashville properties were in the custody of the Probate Court when Jed asserted his crossclaims. *See Chevalier*, 803 F.3d at 804 (holding that federal courts apply the probate exception based on the status of property at the time that a party filed his or her claims in federal court). Jed and Jingbin take opposite sides of this issue. (Doc. No. 58 at 16 (Jed's response); Doc. No. 62 at 2 (Jingbin's reply).) Weighing the evidence necessary to

decide this jurisdictional question, the Court finds that the Nashville properties have never been—and at the time of the filing of Jed's crossclaims were not—in the custody of the Probate Court.

The evidence before the Court reflects as follows. Jingbin and Jerry purchased the Nashville properties in February 2014, July 2017, and August 2018, respectively. (Doc. No. 19-3 (warranty deeds).) In March 2020, Jerry conveyed his interest in the Nashville properties to Jingbin via quitclaim deeds. (Doc. No. 19-4 (quitclaim deeds).) The terms of these quitclaim deeds did not include any limitations on Jerry's conveyance. (*See id.*) Thus, under Tennessee law, these quitclaim deeds "convey[ed] whatever interest [Jerry] ha[d]" in the Nashville properties.[9] *See Houston v. PHH Mortg. Corp.*, No. 3:22-CV-00765, 2023 WL 395789, at *1 n.1 (M.D. Tenn. Jan. 25, 2023) (quoting *In re Johnson*, 187 B.R. 598, 601 (E.D. Tenn. 1994)). So Jerry had already relinquished his ownership interest in the Nashville properties via quitclaim deed prior to his death in September 2020. This Court, therefore, has no factual basis to conclude that the Nashville properties ever entered the custody of the Probate Court. So the probate exception does not apply in this case.

### III. Conclusion

For these reasons, Jingbin's motion to dismiss (Doc. No. 34) will be granted in part and denied in part. Specifically, based on a lack of subject-matter jurisdiction and pursuant to the

---

[9] There is no evidence that Jed challenged the validity of these quitclaim deeds in the Probate Court (as he does in this Court). But even if Jed did raise this argument in the Probate Court, it is unclear how that could have resulted in the Nashville properties (or the value of the Nashville properties) being included in Jerry's estate and thus entering the custody of the Probate Court. Tennessee law provides that a decedent's fraudulent conveyance of property prior to death could result in the voiding of that conveyance or the value of that property being included in the calculation of the decedent's estate, but only "at the election of the *surviving spouse*," and only if the fraudulent conveyance was made "with an intent to defeat the *surviving spouse* of the surviving spouse's distributive or elective share." Tenn. Code Ann. § 31-1-105 (emphasis added). Whatever concerns Jed may have about the quitclaim deeds, Jed is obviously not a "surviving spouse" in this scenario, and his complaint obviously is not that the conveyance of the quitclaim deeds was made with an intent to defraud any surviving spouse (including Jingbin, if in fact she qualifies as such).

domestic relations exception, Jingbin's motion will be granted only as to the portions of Jed's declaratory judgment claim that seek to invalidate the Chinese divorce decree and the Tennessee marriage certificate. (*See* Doc. No. 19, Crossclaim ¶ 54(a), (b), (e)). Likewise, also based on a lack of subject matter-jurisdiction and pursuant to the domestic relations exception, the Court will sua sponte dismiss the portion of Jingbin's declaratory judgment claim that seeks to enforce the Chinese divorce decree and the Tennessee marriage certificate. (*See* Doc. No. 65, Crossclaim at p.16, subsection (b).)

It is worth emphasizing that because the domestic relations exception does not apply to the bulk of the pending claims in this case, the effect of this ruling is limited. The Court simply holds that it lacks subject matter jurisdiction to issue a declaratory judgment that would invalidate or enforce the Chinese divorce decree and the Tennessee marriage certificate. But for the purpose of deciding the remaining pending claims at other stages of the case—including determining the proper beneficiaries of Jerry's benefits—the Court is not precluded from considering argument on the validity of Jingbin and Jerry's marriage, as well as any related evidentiary questions that may arise in the course of considering such argument. These matters may still be addressed by the Court in the context of resolving claims that do not seek performance of functions reserved for state courts under the domestic relations exception.

An appropriate Order will be entered.

_____
ELI RICHARDSON
UNITED STATES DISTRICT JUDGE